*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

SHANAE HIGGENBOTHAM, Individually and in her capacity as Administratrix Ad Prosequendum of the Estate of KEVIN HIGGENBOTHAM, deceased.

                Plaintiff,

v.

CITY OF TRENTON, TRENTON POLICE CHIEF ERNEST PARREY, JR., OFFICER CARLO CAVALLI, OFFICER SAMUEL GONZALEZ, OFFICER E. RAMOS, SERGEANT JASON KMIEC, CAPITAL HEALTH SYSTEMS, INC., CAPITAL HEALTH REGIONAL MEDICAL CENTER, MICHELLE MICALIZZI, R.N., and JOHN DOES 1 through 10,

                Defendants.

Civil Action No. 17-04344 (FLW)

**OPINION**

**WOLFSON, Chief Judge:**

Plaintiff Shanae Higgenbotham ("Plaintiff"), in her capacity as administratrix of the Estate of Kevin Higgenbotham, brought this civil rights action under 42 U.S.C. § 1983 against Defendants, City of Trenton (the "City"), Police Chief Ernest Parrey, Jr. ("Chief Parrey"), Officer Carlo Cavalli ("Cavalli"), Officer Samuel Gonzalez ("Gonzalez"), Officer E. Ramos ("Ramos"), and Sergeant Jason Kmiec ("Kmiec") (collectively, the "Trenton Defendants"),[1] in connection with the arrest and subsequent death of her father, Kevin Higgenbotham ("Higgenbotham"). Presently before the Court is the Trenton Defendants' Motion for Summary Judgment seeking

---

[1] Defendants Capital Health Systems, Inc. ("CHS"), Capital Health Regional Medical Center ("CHRMC"), and Michelle Micalizzi, R.N. ("Micalizzi") did not move for summary judgment on the claims asserted against them.

dismissal of Plaintiff's claims for false arrest and/or false imprisonment in violation of the Fourth Amendment and § 1983, excessive force in violation of § 1983, violation of the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-1, *et seq.*, failure to intervene in violation of § 1983, *Monell* claims for unlawful custom or policy and failure to train in violation of § 1983 against the City and Chief Parrey, and several state law claims for assault and battery, negligence, gross negligence, wrongful death, and survivorship against the Trenton Defendants. Because the Trenton Defendants' briefing, however, only addresses dismissal with respect to Plaintiff's federal claims for false arrest and/or false imprisonment and excessive force, the Court will not dismiss any of the state law claims on this Motion, except for certain claims under the NJCRA which are treated analogously to Plaintiff's § 1983 claims. In addition, Plaintiff consents to the dismissal of her *Monell* claims against the City and Chief Parrey. (Pl. Opp. at 46.) Accordingly, Count Four of Plaintiff's Complaint is dismissed with prejudice.

For the reasons set forth below, the Trenton Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part as follows: summary judgment is **GRANTED** in favor of the Trenton Defendants on Plaintiff's false arrest and/or false imprisonment claim under § 1983 (Count II) and any analogous claims asserted under the NJCRA, and **GRANTED** as to Plaintiff's claims of excessive force under § 1983 (Count I) and any analogous claims asserted under the NJCRA, as to the alleged force used before Higgenbotham was arrested and placed in handcuffs. However, summary judgment is **DENIED** on Plaintiff's excessive force claims under § 1983 and the NJCRA, as it relates to the alleged force applied by Officer Gonzalez after Higgenbotham was handcuffed. In that regard, the excessive force claims under both statutes are dismissed against all other Trenton Defendants. In addition, with respect to Plaintiff's failure to intervene claim under § 1983 (Count III), including any analogous claims asserted under the NJCRA, summary judgment

is **GRANTED** in favor of Officer Gonzalez, Chief Parrey, and the City of Trenton, but it is **DENIED** as to Officer Cavalli, Officer Ramos, and Sergeant Kmiec.  Finally, summary judgment is **DENIED** as to all remaining state law claims against the Trenton Defendants.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following facts are undisputed unless otherwise noted.  On the morning of June 15, 2015, Higgenbotham placed an emergency call, advising the dispatcher that a trespasser was at his home located at 213 Bellevue Avenue in Trenton, New Jersey.  (Trenton Defendants' Statement of Undisputed Material Facts ("Trenton SOF"), ¶¶ 1 and 14.)  Trenton police officer Cavalli responded to the scene of the "verbal dispute."  (Trenton SOF, ¶ 34.)  Upon arrival, Officer Cavalli spoke with Higgenbotham and the alleged trespasser, Higgenbotham's brother, Dwayne Jackson ("Jackson").  (Pl.'s Statement of Undisputed Material Facts in Opposition to Trenton Defendants' Mot.  ("Pl.'s SOF"), ¶¶ 1, 3-4.)  Officer Cavalli observed that Higgenbotham appeared to be "sweating badly, agitated, hyper and upset."  (Trenton SOF, ¶ 36.)

Jackson explained to Officer Cavalli that he resided at the home, which was owned by his mother, Adrienne Higgenbotham ("Adrienne").  (Trenton SOF, ¶ 37.)  Jackson indicated that another brother, Dwayne Fahiym Higgenbotham ("Fahiym"), and Fahiym's seven-year-old son also resided at the home.  (Trenton SOF, ¶ 10.)  Jackson further stated that Higgenbotham had recently moved into the home after having an argument with his girlfriend.  (*Id.*)  Jackson told police that when he returned home that morning at approximately 8:30 a.m., he observed that numerous items had been removed from the house and placed on the front porch.  (Trenton SOF, ¶ 12.)  As Jackson approached the residence, Higgenbotham exited the house and prevented Jackson from entering.  (*Id.*)  Eventually, Higgenbotham allowed Jackson to enter the house, but

he called police soon thereafter.  (Trenton SOF, ¶ 14.)  Jackson also informed Officer Cavalli that Higgenbotham was bipolar, and that he had not been taking his medication.  (Trenton SOF, ¶ 16.)[2]

Here, the parties' versions of events begin to diverge.  As Officer Cavalli continued speaking with Jackson, Higgenbotham grew more agitated, yelling at Officer Cavalli to "do your job" and "arrest [Jackson]" for trespassing.  (Trenton SOF, ¶ 39.)  In an effort to separate the individuals, Officer Cavalli instructed Jackson to remove some belongings from the house until Adrienne returned. (Trenton SOF, ¶ 40.)  Around this time, Trenton police officer Gonzalez arrived at the house as backup for Officer Cavalli.  (Trenton SOF, ¶ 41.)  While the police officers were outside the home with Jackson, Jackson called his mother.  (Trenton SOF, ¶ 17.)  Adrienne explained to Officer Cavalli that Higgenbotham had been acting "crazy," that he was "off his meds," and that she wanted the police officers to remove him from the house.  (Pl.'s SOF, ¶ 5.) Officer Cavalli explained to Adrienne that Higgenbotham had not done anything at that time to warrant his arrest.  (Trenton SOF, ¶ 18.)  According to the Trenton Defendants, however, this changed when Jackson informed Officer Cavalli that Higgenbotham had assaulted him that morning.  (Trenton SOF, ¶ 19.)  The Trenton Defendants state that after handing the phone back to Jackson, Officer Cavalli overheard Jackson telling his mother that Higgenbotham had placed him in a painful "bear-hug." (Trenton SOF, ¶ 44; Pl. Opp. to Motion for Summary Judgment, Ex. H at 9:18 to 10:11.)  The Trenton Defendants further state that Jackson then informed the Officers that prior to their arrival, Higgenbotham had struck him three times.  (Trenton SOF, ¶ 44.)  In that

---

[2]     In an interview of Adrienne, conducted several hours after Higgenbotham's arrest, she told investigators that Higgenbotham had been diagnosed with bipolar disorder approximately five years earlier.  (Trenton SOF, ¶ 74.)  She explained that while he had been prescribed medication, he did not take it.  (*Id.*)  According to Adrienne, she had anticipated this "episode," as Higgenbotham had grown more agitated in the days prior to the incident on June 15, 2015. (Trenton SOF, ¶ 75.)

regard, Officer Cavalli testified that Jackson's shirt was ripped, and that he observed what appeared to be fingernail scratches on Jackson's chest and Jackson expressed to him that his ribs hurt. (Trenton SOF, ¶ 45; Pl.'s SOF, ¶ 10.)[3]  Officer Cavalli testified that based on these observations, he had probable cause to arrest Higgenbotham for simple assault.

Plaintiff's version is slightly different.  According to Plaintiff, Jackson never asked the Officers to look at his body for injuries and they did not look at his chest.  (Pl.'s SOF, ¶ 11.) Rather, Jackson testified that while he did tell the police his ribs hurt, the incident with Higgenbotham that morning was "nothing serious."  (Pl.'s SOF, ¶ 19.)  According to Jackson, he and Higgenbotham would regularly "play fight," and therefore, he was not scared of him.  (Pl.'s SOF, ¶¶ 12, 14.)  Plaintiff further highlights that Jackson declined Officer Cavalli's offer for medical treatment.  (Pl.'s SOF, ¶ 16.)

Nonetheless, Officer Cavalli informed Higgenbotham that he was under arrest for the simple assault allegedly committed against Jackson.[4]  According to the Trenton Defendants, Higgenbotham ignored Officer Cavalli's instructions to place his hands behind his back, resisting arrest.  Officer Cavalli testified that Higgenbotham begin clenching his fists and kept repeating phrases like "you ain't taking me to jail."  (Cavalli Dep. Tr. at 28:6 to 21.)   As a result, Officer Cavalli pepper sprayed Higgenbotham in the facial area.  Despite complaining that the pepper spray "burned his face," Officer Cavalli testified that Higgenbotham appeared "normal," as if the

---

[3]     Officer Gonzalez also testified to observing "red scratch marks" on the center of Jackson's chest.  (Gonzalez Dep. Tr. at 37:13 to 24.)

[4]     Officer Cavalli later signed complaints against Higgenbotham for simple assault in violation of N.J.S.A. 2C:12-1A, improper behavior in violation of N.J.S.A. 2C:33-2A-1, resisting arrest in violation of N.J.S.A. 2C:29-2A(1), and criminal mischief in violation of N.J.S.A. 2C:17-3A(1).  (Trenton SOF, ¶ 64.)

pepper spray had no effect.  Thus, Officer Cavalli testified that he also struck Higgenbotham with his baton.  (*Id.* at 29:13 to 30:11.)

Again, Plaintiff's version of events differs.  According to Plaintiff, Higgenbotham initially complied with Officer Cavalli's instructions to get on his knees and place his hands on his head; however, once on his knees, Higgenbotham moved his hands from his head to his side, at which point, Officer Cavalli deployed his pepper spray without warning.  (Jackson Dep. Tr. at 56:5 to 57:2; 58:23 to 59:1.)  As a result of the pepper spray, Higgenbotham stood up, and, according to Jackson, Officer Cavalli pepper sprayed Higgenbotham a second time.  (*Id.* at 59:4 to 15.)  Both parties agree that upon being pepper sprayed, Higgenbotham fled inside the house.  (Jackson Dep. Tr. at 59:16 to 20; Cavalli Dep. Tr. at 31:11 to 17.)[5]

Once inside the home, it is undisputed that Higgenbotham ran to the kitchen sink to rinse the pepper spray from his face, before then running to a nearby bathroom.  (Pl.'s SOF, ¶ 40.)  As Officer Cavalli and Officer Gonzalez prevented Higgenbotham from closing the bathroom door, Higgenbotham continued to resist arrest.  (Pl.'s SOF, ¶¶ 41-42.)  As a result, Officer Cavalli struck Higgenbotham three to five additional times with his baton on the hands and arms.  (Pl.'s SOF, ¶ 43.)  In addition, Officer Gonzalez pepper sprayed Higgenbotham in the bathroom.[6]  (Pl.'s SOF, ¶ 42; Trenton SOF, ¶ 68.)   Despite the Officers' attempts to subdue Higgenbotham, however, he

---

[5]     Officer Gonzalez's description of the events surrounding Higgenbotham's arrest is substantially similar to Officer Cavalli's testimony.   According to Officer Gonzalez, Higgenbotham violently pushed Officer Cavalli away when Cavalli tried to handcuff Higgenbotham.  (Gonzalez Dep. Tr. at 39:1 to 7.)  During a 15 to 20 second tussle on the porch between Officer Cavalli and Higgenbotham, Officer Gonzalez testified that Cavalli pepper sprayed Higgenbotham in the face.  (*Id.* at 39:12 to 43:1.)  Upon being pepper sprayed, Higgenbotham ran into the house, applying water to his face at the kitchen sink.  (*Id.* at 43:21 to 44:3.)

[6]     Jackson testified that he did not observe precisely what occurred inside the bathroom; however, he could see one officer hitting Higgenbotham with his hands.  (Jackson Dep. Tr. at 61:22 to 63:12.)

again managed to flee.  (Trenton SOF, ¶ 41.)  Higgenbotham ran from the bathroom to the back porch, before ultimately returning inside the house where he disappeared.  (Pl.'s SOF, ¶ 45.)  After Officers Cavalli and Gonzalez could not locate Higgenbotham on the first floor of the home, they requested a K-9 officer search to clear the house.  (Pl.'s SOF, ¶ 48.)  Michael Luccessi, a K-9 officer with the Trenton Police Department, responded to the residence, searched the house, and determined that Higgenbotham was not inside.  (Pl.'s SOF, ¶ 49; Trenton SOF, ¶ 242.)  By this time, numerous officers had arrived at the home, including Trenton police officer Ramos, Sergeant Kmiec, and members of the Mercer County Sheriff's Department.  (Pl.'s SOF, ¶¶ 50, 53.)  A short time after the house was cleared, a sheriff's unit observed Higgenbotham jumping off the roof of the home and onto the ground, at which point he was handcuffed and placed under arrest.  (Trenton SOF, ¶ 148.)  The Sheriff's Department transferred custody of Higgenbotham on site to Officer Cavalli and the Trenton Police Department.  (Pl.'s SOF, ¶ 56.)

After Officer Cavalli placed the handcuffed Higgenbotham in the police car, Higgenbotham allegedly began kicking the inside of the vehicle, damaging the door.  (Trenton SOF, ¶ 84, 201; *see also* Cavalli Dep. Tr. at 48:20 to 25.)  To prevent the kicking, Officer Cavalli and Officer Gonzalez testified that they attempted to secure Higgenbotham with a seatbelt. (Cavalli Dep. Tr. at 49:17 to 22; Gonzalez Dep. Tr. at 64:21 to 65:4.)  According to Officer Gonzalez, however, when he opened the car door, Higgenbotham pushed his head into him and continued to kick in an attempt to push Gonzalez from the vehicle.  (Gonzalez Dep. Tr. at 65:5 to 12.)  As a result, Officer Gonzalez deployed his pepper spray.  (*Id.* at 65:13 to 14.)  While it is undisputed that Officer Gonzalez pepper sprayed Higgenbotham while he was restrained in the backseat of the police car, the circumstances surrounding this application, including the number of sprays, is disputed.

7

According to Plaintiff, Keesha Douglas ("Douglas"), a neighbor, observed and corroborated that Higgenbotham coughed and kicked once the police placed Higgenbotham in the vehicle. (Pl.'s SOF, ¶ 59.) Douglas also testified that she heard Higgenbotham state, "I can't breathe in here," approximately three or four times. (Pl.'s SOF, ¶ 60.)[7] In response to Higgenbotham's kicking, Douglas testified that she overheard Officer Gonzalez state, "I'm tired of this shit," before opening the door to the police car and pepper spraying Higginbotham. (Pl.'s SOF, ¶ 61; *see also* Douglas Dep. Tr. at 37:23 to 39:19.) According to Douglas, Higgenbotham's kicking only increased after Officer Gonzalez's first spray, causing Gonzalez to spray Higgenbotham a second time inside the vehicle. (Pl.'s SOF, ¶ 62; *see also* Douglas Dep. Tr. at 43:22 to 44:10.) While Officer Gonzalez testified that he sprayed Higgenbotham only once, Officer Cavalli's video recorded statement on the day of the arrest indicates that Gonzalez may have pepper sprayed Higgenbotham "a couple of times" when he was restrained in the vehicle. (*Id.*; Cavalli Video Statement Transcript at 20:14 to 21:8.)

A short time thereafter, Officer Cavalli transported Higgenbotham to Capital Health Regional Medical Center ("Capital Health") for a crisis evaluation. (Trenton SOF, ¶ 72.) At Capital Health, Higgenbotham was placed in restraints. (Pl.'s SOF, ¶ 73.) A short time later, he unexpectedly went into cardiac/respiratory arrest, and although physicians in the emergency room revived Higgenbotham, he never regained consciousness. (Pl.'s SOF, ¶ 76.) On March 12, 2016, Higgenbotham died from sepsis while at the Atrium Post-Acute Care facility in Lawrence, New Jersey. (Trenton SOF, ¶ 155.)

---

[7] Jackson also testified that he heard Higgenbotham saying that he could not breathe in the police car. (Jackson Dep. Tr. at 72:22-25.)

On June 14, 2017, Plaintiff filed the instant Complaint, which asserts the following fifteen claims:

- Count I, for excessive force under § 1983, against the Trenton Defendants;

- Count II, for false arrest and/or false imprisonment under the Fourth Amendment, pursuant to § 1983, against the Trenton Defendants;

- Count III, for failure to intervene under § 1983, against the Trenton Defendants;

- Count IV, *Monell* claims for unlawful custom or policy and failure to train, against Defendants Chief Parrey and the City of Trenton;

- Count V, for violation of the New Jersey Civil Rights Act, N.J.S.A. 10:6-1, *et seq.*, against the Trenton Defendants;

- Count VI, for common law assault and battery, against all Defendants;

- Count VII, for false arrest and/or false imprisonment, against all Defendants;

- Count VIII, for common law negligence, against the Trenton Defendants;

- Count IX, for common law negligence and/or professional negligence, against Defendant Micalizzi;

- Count X, for common law negligence and/or professional negligence, against John Doe Defendants;

- Count XI, for common law negligence and/or professional negligence, against Defendants CHS and CHRMC;

- Count XII, for corporate negligence, against Defendants CHS and CHRMC;

- Count XIII, for gross negligence, against all Defendants;

- Count XIV, for wrongful death, against all Defendants; and

- Count XV, for survivorship, against all Defendants.

## II.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable [factfinder] could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the

nonmoving party's claim." *Id.*  Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999).  In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.  Credibility determinations are the province of the factfinder.  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).  There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III.  DISCUSSION

The Trenton Defendants argue summary judgment is appropriate on all federal claims brought against them because (1) probable cause existed for Higgenbotham's arrest, (2) the force exercised by Officer Cavalli and Officer Gonzalez, including the use of a collapsible baton and pepper spray, was reasonable under the circumstances, and (3) even if the force was unreasonable, the Trenton Defendants are entitled to qualified immunity.  Despite moving for dismissal of all claims, however, the Trenton Defendants do not address Plaintiff's claims for failure to intervene or any of the state law claims asserted against them.  For the following reasons, the Court will

grant summary judgment on the false arrest and/or false imprisonment claim, and partially grant summary judgment on the excessive force and failure to intervene claims.

### A.      False Arrest and False Imprisonment

The Trenton Defendants are entitled to summary judgment on the false arrest and/or false imprisonment claim asserted in Count II of Plaintiff's Complaint.  To make out either a false arrest or false imprisonment claim, Plaintiff must demonstrate that his arrest was unsupported by probable cause.  *See Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995) (proving false arrest requires a showing of an absence of probable cause); *Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995) (citing *Baker v. McCollan*, 443 U.S. 137, 143-44 (1979)) ("[A]n arrest based on probable cause [cannot] become the source of a claim for false imprisonment."). "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti*, 71 F.3d at 483.  It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby*, 138 S.Ct. at 586 (quoting *Illinois v. Gates*, 462 U.S. 213, 243-44 n.13 (1983)); *see also Maryland v. Pringle*, 540 U.S. 366, 371-72 (2003) (holding that police officers had probable cause to arrest all three occupants of a vehicle where cocaine was accessible to all three).

As such, the Trenton Defendants need only show that there was probable cause for one of the charges brought against Higgenbotham in order to defeat the wrongful arrest or imprisonment claim.  Officer Cavalli signed complaints against Higgenbotham for simple assault, improper behavior, resisting arrest, and criminal mischief.  (Trenton SOF, ¶ 64.)  In accordance with N.J.S.A. 2C:12–1, "A person is guilty of simple assault if he: (1) [a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury to another[.]"

Here, Plaintiff argues that summary judgment is inappropriate because probable cause did not exist for Higgenbotham's arrest.  Specifically, Plaintiff argues that when they arrived at the scene of the purported "verbal dispute," neither Officer Cavalli nor Officer Gonzalez had reason to arrest Higgenbotham.  Plaintiff emphasizes that Higgenbotham, not Jackson called the police, Jackson never complained to the Officers that Higgenbotham assaulted him, nor did he request charges be filed against Higgenbotham, and Plaintiff further disputes that Jackson showed the Officers any signs of injury.  I disagree.

First, the fact that the dispatcher characterized the incident as a "verbal dispute" and that Higgenbotham, not Jackson, called the police is irrelevant.  Further, there is evidence that Officers Cavalli and Gonzalez observed the physical injuries to Jackson's chest, which included several scratches a couple inches in length, and Jackson testified that he told Officer Cavalli and Officer Gonzalez that his ribs hurt because Higgenbotham placed him in a "bear-hug."  Neither Jackson, nor Plaintiff, contest that those injuries actually existed.  Rather, Plaintiff only refutes the Trenton Defendants' claim that Jackson showed the Officers his chest.  In addition, Officer Gonzalez testified that while the Officers were speaking with Jackson in the yard, Higgenbotham threatened to "put [his] hands on" Jackson again, if Jackson tried to come inside the house again.  (*See* Gonzalez Dep. Tr. at 37:4 to 12.)  Despite Plaintiff's contention, the fact that Jackson may not have been scared or intimidated by Higgenbotham, or that Jackson appeared calm following the incident, is of no moment.  The Officers had probable cause to arrest Higgenbotham for simple assault.[8]  Accordingly, because the Officers had probable cause to arrest Higgenbotham, Plaintiff

---

[8]     Indeed, further support for Higgenbotham's arrest may also exist under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-21 ("PDVA"), which mandates arrest where probable cause exists to believe that domestic violence has occurred, and the victim exhibits signs of injury. *See* N.J.S.A. 2C:25–21(a)(1).  Here, the Officers' testimony reveals their belief at the scene of the incident that Higgenbotham's arrest was justified based on the domestic altercation between

cannot establish that the Trenton Defendants deprived Higgenbotham of constitutional rights in arresting him.   Thus, I will grant summary judgment on Plaintiff's false arrest and false imprisonment claims under § 1983 in favor of the Trenton Defendants.

### B.    Excessive Force Claim

In Count I of her Complaint, Plaintiff claims that Officers Cavalli and Gonzalez used excessive and objectively unreasonable force under the circumstances.[9]   Specifically, Plaintiff identifies the following specific examples of excessive force by Officers Cavalli and Gonzalez during Higgenbotham's arrest: (1) two applications of pepper spray on the front porch by Officer Cavalli, (2) one application of pepper spray in the bathroom by Officer Gonzalez, (3) three applications of pepper spray by Officer Gonzalez while Higgenbotham was handcuffed in the back seat of the police car, and (4) Officer Cavalli's multiple uses of his collapsible baton.  (*See* Pl. Opp. at 50.)

The Trenton Defendants move for summary judgment on Plaintiff's excessive force claim, arguing that the force employed was reasonable, and, even if the force used was not objectively reasonable, the Officers are nonetheless entitled to qualified immunity.  (*See*, *e.g.*, Trenton Def. Moving Br.)  Specifically, the Trenton Defendants emphasize that Higgenbotham's elusive and

---

Higgenbotham and his brother, Jackson, in which Jackson acknowledged sustaining injuries. However, because the Officers did not ultimately charge Higgenbotham under the PDVA, I will not consider it as a basis for probable cause.

[9]      To the extent that Plaintiff's Complaint blanketly asserts claims of excessive force against "all Defendants except CHS, CHRMC, & Micalizzi," the Court dismisses those claims as to Chief Parrey, Officer Ramos, and Sergeant Kmiec because the Complaint contains no allegations that those defendants used excessive force against Higgenbotham.  Moreover, Plaintiff cannot assert excessive force claims against the City, because vicarious liability does not exist in the context of § 1983.  *See Mulholland v. Gov't Cty. of Berks*, 706 F.3d 227, 237 (3d Cir. 2013) (internal quotation marks and citations omitted) ("Based on the Supreme Court's reasoning in the landmark *Monell* case, courts have recognized a 'two-path track to municipal liability under § 1983, depending on whether the allegation is based on municipal policy or custom.'")

physically aggressive behavior lasted approximately fifteen to twenty minutes, involved the pursuit of multiple law enforcement officers and agencies, and could have potentially resulted in significant injury to himself or others.  (*Id.* at 8.)  Therefore, according to the Trenton Defendants, the police officers' use of the force in effectuating the arrest was not only necessary and objectively reasonable, but in accordance with the New Jersey Attorney General Use of Force Guidelines.  (*Id.* at 18.)  In response, Plaintiff maintains that there is a genuine issue of material fact as to whether the Officers' use of force was objectively reasonable, and therefore summary judgment is inappropriate.  (*See* Pl.'s Opp. at 50.)

Qualified immunity is "an entitlement not to stand trial or face the burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Under this doctrine, a government official is immune from claims for damages unless, interpreting the allegations in the light most favorable to plaintiff, they show (1) that the official violated the plaintiff's constitutional rights, and (2) that the constitutional right that was violated was clearly established.  *Id.* at 201; *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions ... are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.").  A right is considered clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658 (2012) (alterations omitted); *see also Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015).

The Court's analysis thus begins with determining whether Officers Cavalli and Gonzalez violated Higgenbotham's constitutional rights.[10]  Where excessive force is alleged, courts in this circuit determine whether a constitutional violation has occurred using the Fourth Amendment's objective reasonableness test set forth in *Graham v. Connor*, 490 U.S. 386, 395–97 (1989), even in the context of examining qualified immunity.  *See Curley*, 499 F.3d at 206–07.  To determine whether an officer acted with objective reasonableness, courts must balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (internal citation omitted).  This inquiry is individualized and highly fact-specific, but three factors must be considered: "(1) the severity of the crime at issue, (2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, and (3) whether the suspect attempts to resist arrest or flee the scene." *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015).  Other factors relevant to this inquiry include "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time."  *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).  Finally, the objective reasonableness of a particular use of force is evaluated from "the perspective of the officer at the time of the incident and not with the benefit of hindsight." *Santini*, 795 F.3d at 417 (citation omitted); *see Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (citation omitted)).  Thus, within the context of an excessive force claim, the

---

[10]      The parties do not dispute that force was used in effectuating Higgenbotham's arrest, and therefore, the Court limits its analysis to whether that force was reasonable under the circumstances.

16

"standard of reasonableness at the moment applies: 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  Rather, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

Based on the allegations in the Complaint, evidence in the record, and because the law in this district is clear that the force used may "become excessive as ... events unfold," *Lamont v. New Jersey*, 637 F.3d 177, 184 (3d Cir. 2011), I will consider the Trenton Defendants' use of force in two distinct categories: (1) force exercised prior to Higgenbotham being handcuffed and (2) force exercised after Higgenbotham was handcuffed.

### 1. *Force Exercised Prior to Higgenbotham Being Handcuffed*

First, it is undisputed that Officers Cavalli and Gonzalez used force in arresting Higgenbotham.  The following acts of force occurred prior to Higgenbotham being handcuffed: Officer Cavalli pepper sprayed Higgenbotham at least once outside of the home on the front porch, Officer Gonzalez pepper sprayed Higgenbotham once in the bathroom, and Officer Cavalli struck Higgenbotham multiple times with his collapsible baton both outside of the home and in the bathroom.  In addition, Plaintiff claims that Officer Cavalli pepper sprayed Higgenbotham a second time on the front porch.  According to Plaintiff, the Trenton Defendants' use of force was excessive because the crime Higgenbotham allegedly committed was minor and the circumstances surrounding his resistance are disputed.  Specifically, Plaintiff argues that Higgenbotham posed no "immediate threat to the safety of the officers or others."  Moreover, Plaintiff contends that

Higgenbotham's act of running to the kitchen sink to rinse the pepper spray from his face cannot be considered an act of resistance, because it was merely reactive.  Similarly, Plaintiff suggests that Higgenbotham's flight from the bathroom was an attempt to escape the Officers' repeated baton strikes and not an act of evasion.  Applying the *Graham* factors to the present dispute, however, the force used by the Officers was reasonable under the totality of the circumstances.

Looking to the first *Graham* factor, the suspected crime at the time of the arrest, Plaintiff maintains that because the crimes of simple assault, improper behavior, and criminal mischief are disorderly persons offenses, they are not particularly severe.  (Pl. Opp. at 51.)  Although the Court acknowledges that the injuries sustained by Jackson were not particularly severe, as discussed *supra*, the Officers had probable cause to arrest Higgenbotham based on a suspicion of simple assault, of which there was a domestic component.  In fact, while the Officers did not ultimately charge Higgenbotham under the PDVA, the Use of Force Report characterizes the incident as "domestic."  (*See* Pl.'s SOF, ¶ 64) (citing the Use of Force Report at Ex. E.)  To that end, the Court acknowledges that domestic assault is, without doubt, serious.  As referenced above, New Jersey has recognized the severity of this conduct by adopting a statute, the PDVA, which expressly mandates that a law enforcement officer effectuate an arrest where probable cause exists to believe that domestic violence has occurred, and the victim exhibits signs of injury.  *See* N.J.S.A. 2C:25–21(a)(1).  Accordingly, the Court finds that although it may be categorized as a disorderly persons offense, the crime of simple assault, in this context, is serious.  Thus, the first *Graham* factor weighs in favor of the Officers.

In addition, the second and third *Graham* factors, which consider whether Higgenbotham posed an imminent threat to the safety of the Officers or attempted to resist arrest, also weigh in favor of the Officers.  Here, it is undisputed that neither Officer Cavalli, nor Officer Gonzalez,

used force against Higgenbotham until Higgenbotham began actively, and physically, resisting arrest.

Both Officers testified that once the decision to arrest Higgenbotham was made, Higgenbotham refused to comply with their commands.  Specifically, Officer Cavalli testified that as he approached Higgenbotham to handcuff him, Higgenbotham clenched his fists and repeated phrases like "you ain't taking me to jail." (Cavalli Dep. Tr. at 28:6 to 21.)  Indeed, Officer Cavalli only deployed his pepper spray after a 15 to 20 second "tussle" with Higgenbotham.  (Gonzalez Dep. Tr. at 39:16 to 41:22.)  Moreover, even Jackson's testimony, upon which Plaintiff relies to show an existence of disputed facts surrounding the circumstances of Higgenbotham's arrest, supports a finding that Higgenbotham resisted arrest.  Specifically, while Plaintiff emphasizes Jackson's testimony that Higgenbotham momentarily complied with Officer Cavalli's instructions, Jackson also acknowledged that at some point after that temporary compliance, Higgenbotham moved his hands from his head to his sides.  It is undisputed that this movement defied the Officers' commands, and therefore, may be construed as an act of resistance.  Whether Officer Cavalli pepper sprayed Higgenbotham once or twice on the porch does not alter the Court's findings.[11] Clearly, from the objective perspective of a reasonable law enforcement officer, when faced with an individual physically resisting arrest who is approximately 5 feet 11 inches tall and weighs 260 pounds, suspected of recently committing domestic assault against his brother, and actively experiencing either a psychological episode or under the influence of illicit drugs, one or two

---

[11]     Similarly, whether or not Higgenbotham was lifting weights in the presence of the Officers prior to their attempt to handcuff him, which the Trenton Defendants theorize may have been an act of intimidation, does not impact the Court's analysis or findings. (Cavalli Dep. Tr. at 27:20 to 28:3; Gonzalez Dep. Tr. at 33:10 to 33:25.)  Put simply, even without that fact, the record is clear that Higgenbotham was resisting arrest.

applications of pepper spray and several baton strikes is objectively reasonable to avoid injury and effectuate the arrest.

From that point forward, until he was apprehended and handcuffed by the Sheriff's Department, Higgenbotham continued to elude the officers and resisted arrest. The testimony demonstrates that Higgenbotham led the police officers on a dangerous chase in and out of his home,[12] including to the kitchen sink where he attempted to alleviate the effects of the pepper spray. Although this could be considered instinctive or reactionary, as Plaintiff posits, this does not explain Higgenbotham's continued resistance and elusive behavior once he left the kitchen. In fact, the uncontroverted evidence reveals that after rinsing his face, Higgenbotham continued to ignore the Officers' commands. Rather than wash his face, drop to his knees, and place his hands on his head or behind his back, Higgenbotham proceeded to the bathroom, where, according to Plaintiff, he attempted to make a phone call. As a result, Officer Gonzalez's use of pepper spray and Officer Cavalli's baton strikes in the bathroom were reasonable attempts by those officers to gain control of Higgenbotham and prevent harm to themselves, Higgenbotham, or others.

Specifically, with respect to the baton strikes employed by the Officers in effectuating Higgenbotham's arrest, which include those on the front porch, in the bathroom, and on the back porch, there is no dispute that Higgenbotham was not complying with the Officers' commands when that force was exercised. To be certain, there is no evidence in the record, nor argument presented by Plaintiff that the Officers continued to strike Higgenbotham with their batons after he was subdued, handcuffed, and no longer posing a threat to himself or others. Rather, the record

---

[12]     Officer Gonzalez testified that although Higgenbotham never possessed a weapon, nor was a weapon ever recovered at the scene, at one point during their pursuit of Higgenbotham, Higgenbotham picked up a weedwhacker on the back porch. (Gonzalez Dep. Tr. at 50:10 to 51:1.) According to Officer Gonzalez, however, when he drew his gun and instructed Higgenbotham to drop the weedwhacker, he complied. (*Id.*)

reveals that those strikes occurred when Higgenbotham disregarded police commands, ran inside the home, including to the kitchen and bathroom where he could have presumably accessed knives, razors, and other weapons.  Moreover, although the true quantity of the strikes employed by the Officers is unknown, especially because Higgenbotham cannot provide testimony, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.  Here, the record reflects three instances where the Officers struck Higgenbotham with their batons, which according to Plaintiff produced a minimum of six to eight strikes.  Considering the continuous nature of the Officers' pursuit of Higgenbotham, discussed more fully above, I do not find the baton strikes objectively unreasonable.

Further, I am mindful of the impact mental illness and an individual's mental state can have on an incident like the one underlying this case.  Here, the record is clear with respect to Higgenbotham's mental state at the time of the incident: the police were aware Higgenbotham may have been suffering a bipolar episode at the time of arrest.  Indeed, prior to Higgenbotham's arrest, the Officers spoke with Jackson and Higgenbotham's mother, who both informed the Officers that Higgenbotham was bipolar and had not been taking his medication.  Thus, the Officers were aware of Higgenbotham's mental state during the incident. While the Third Circuit has not, at least one Circuit, has incorporated mental wellness into its excessive force analysis.  Although the Ninth Circuit has "refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals," they have found that "if officers believe a suspect is mentally ill, they should make a greater effort to take control of the situation through less intrusive means." *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1078 (9th Cir. 2019), *cert. denied sub nom., City*

*of Bakersfield, California v. Crawford*, 141 S. Ct. 234 (2020) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010) (internal quotations omitted)).  Accordingly, the Ninth Circuit has found that "whether the suspect has exhibited signs of mental illness is one of the factors the court will consider in assessing the reasonableness of the force used, in addition to the *Graham* factors, the availability of less intrusive force, and whether proper warnings were given."  *Vos v. City of Newport Beach*, 892 F.3d 1024, 1034, n.9 (9th Cir. 2018); *see also Glenn v. Washington Cty.*, 673 F.3d 864, 875 (9th Cir. 2011) ("Another circumstance relevant to our analysis is whether the officers were or should have been aware that [the individual] was emotionally disturbed."); *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) ("Even when an emotionally disturbed individual is 'acting out' ..., the governmental interest in using [deadly] force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual.").  Recognizing that the Third Circuit has not had the occasion to speak on this issue, I nevertheless find the Ninth Circuit's framework persuasive.

Here, taking that legal framework into consideration, I do not find the Officers could have used less intrusive means to effectuate the arrest.  Courts have routinely found that pepper spray is of limited intrusiveness, and it is designed to disable a suspect without causing permanent physical injury.  *Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002) (finding that pepper spray is generally of limited intrusiveness).  Similarly, striking a suspect with a baton, especially in the hands and arms as the Officers testified, would be considered less intrusive than alternatives like the use of a K-9 or drawing a service weapon.  Moreover, as stated above, this was a rapidly unfolding situation.  Upon arriving at the scene, the Officers found Higgenbotham yelling profanities and acting in a threatening manner towards Jackson.  Higgenbotham then ignored or failed to comply with each request and command that Officers Cavalli and Gonzalez issued, and

he unambiguously conveyed through his words and actions that he had no intent to cooperate. When Officer Cavalli attempted to handcuff Higgenbotham, it is undisputed that he disobeyed, moving his hands in an unpredictable manner contrary to the Officers' directions.  As a result, Higgenbotham and Officer Cavalli engaged in what Officer Gonzalez described as a "tussle." Rather than use more intrusive force in this dangerous encounter, however, Officer Cavalli pepper sprayed Higgenbotham and deployed his baton.  Similarly, when Higgenbotham escaped into the home and the Officers pursued, they did not escalate their use of force.  Accordingly, it is not clear what other less intrusive alternatives existed without further jeopardizing the safety and well-being of the Officers, Higgenbotham, Jackson, and other residents nearby.  To the extent alternatives were available, I find that this factor does not significantly impact the core *Graham* factors and the overall reasonableness assessment based on Higgenbotham's refusal to obey commands and physical resistance, even if he was mentally unstable.  *See Rockwell v. Brown*, 664 F.3d 985, 988 (5th Cir. 2011) (finding an officer's use of deadly force on an individual known to be bipolar and schizophrenic reasonable under the circumstances where the individual "posed a significant and imminent threat of serious physical harm to one or more of the officers"); *Holloman v. Rawlings-Blake*, No. 14-1516, 2015 WL 4496413, at *4 (D. Md. July 22, 2015), *aff'd sub nom.*, *Holloman v. Markowski*, 661 F. App'x 797 (4th Cir. 2016) (finding the use of deadly force against an unarmed individual known to be bipolar justified where the individual could not be restrained by two police officers, refused to obey commands, and punched one of the officers).

Finally, "[t]he reasonableness of the use of force is normally an issue for the jury."  *Rivas*, 365 F.3d at 198 (citation omitted); accord *Curley*, 499 F.3d at 209–10 ("[A] jury can evaluate objective reasonableness when relevant factual issues are in dispute." (quoting *Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002) (footnote omitted)); *Abraham*, 183 F.3d at 290 ("[S]ince we lack

a clearly defined rule for declaring when conduct is unreasonable in a specific context, we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of 'reasonableness' is itself reasonable and widely shared."). However, where there is no genuine issue of material fact, as is the case here, the question of qualified immunity is one "of law that is properly answered by the court, not a jury." *Curley*, 499 F.3d at 211 (citing *Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004)). Accordingly, after weighing the *Graham* factors, because the Court finds that based on uncontroverted evidence, Officers Cavalli and Gonzalez's use of force prior to handcuffing Higgenbotham was not "objectively unreasonable" under the circumstances, they are entitled to qualified immunity for that conduct.

### 2.    Force Exercised After Higgenbotham was Handcuffed

With respect to Officer Gonzalez's use of force -- the use of pepper spray in the rear compartment of the police car -- after Higgenbotham was handcuffed, I find that a genuine dispute of material fact exists as to whether Officer Gonzalez's conduct was objectively reasonable. The Complaint alleges that once handcuffed, Higgenbotham advised the police officers that he could not see. (Compl., ¶ 32.) Rather than relieve the irritation from the pepper spray, however, the Officers purportedly "shut the door to the police vehicle and left him to struggle with the effects of the pepper spray in the small, enclosed space." (*Id.*) The Complaint further alleges that Higgenbotham then began kicking inside the police vehicle in response to the irritation from the pepper spray. (*Id.* at ¶ 33.) Again, rather than alleviate the effects of the pepper spray, the Officers allegedly opened the vehicle's door and pepper sprayed the restrained Higgenbotham. (*Id.*) When Higgenbotham's kicking continued, Plaintiff alleges that the Officers pepper sprayed Higgenbotham a second time inside the vehicle. (*Id.* at ¶ 35.) On this motion, the Trenton Defendants argue that summary judgment is appropriate because Officer Gonzalez's use of pepper

spray following Higgenbotham's arrest was reasonable based on Higgenbotham's continued refusal to heed the Officers' commands to stop kicking inside the police car.  In further support, the Trenton Defendants argue that neither on-the-scene witnesses Douglas nor Jackson observed "any outward signs of injury [to Higgenbotham] or difficulty in ambulating" when Higgenbotham was placed inside the police car.  Thus, according to the Trenton Defendants, Officer Gonzalez was not aware at the time he deployed his pepper spray, that it was "causing any long-lasting physical injury" or was having any adverse effect on Higgenbotham.

In response, Plaintiff argues that the Trenton Defendants' use of force once Higgenbotham was handcuffed was unreasonable because Higgenbotham was not resisting arrest once he was handcuffed.  (Pl. Opp. at 58-67.)  According to Plaintiffs, the testimony shows that Higgenbotham was calm and non-combative while walking to the police car.  It was not until he was placed inside the car that he began kicking and expressed an inability to see and breathe.  Moreover, Plaintiff stresses that because the rear of the police vehicle had both regular and plexiglass windows, Higgenbotham's escape was impossible.  (*Id.*)

As a preliminary matter, the Court acknowledges that Higgenbotham's kicking and pushing in the rear compartment of the police car necessitated the use of reasonable force to ensure the Officers' safety, the safety of Higgenbotham, and prevent significant damage to the police vehicle.  According to the Officers, Higgenbotham began "violently" kicking and screaming upon being placed in the rear compartment of the police car.  (Gonzalez Dep. Tr. at 59:22 to 60:19; Kmiec Dep. Tr. at 46:10 to 20.)[13]  *See Simmons v. Timek*, No. 04-0572, 2007 WL 4556955, at \*10-11 (D.N.J. Dec. 19, 2007) (finding a police officer's use of pepper spray to subdue an arrestee

---

[13]     Higgenbotham's kicking was also corroborated through the testimony of Jackson and Douglas.  (*See* Jackson Dep. Tr. at 103:14 to 19; Douglas Dep. Tr. at 34:11 to 21.)

reasonable where the arrestee was kicking the windows and doors of a patrol car); *see also Nigro v. Carrasquillo*, 152 F. Supp. 3d 1364, 1370 (S.D. Fla. 2015), *aff'd*, 663 F. App'x 894 (11th Cir. 2016) (finding that a police officer was entitled to qualified immunity where he pepper sprayed a handcuffed arrestee twice when the arrestee refused to stop kicking the window inside the police car).  Specifically, Higgenbotham was laying across the rear compartment of the police car with his back facing the driver's side of the car and his feet kicking the rear passenger side door.  (*Id.*) Indeed, he was kicking so hard that Officer Gonzalez testified that he was damaging the police car. (Gonzalez Dep. Tr. at 60:1 to 3; 62:16 to 21.)  To subdue Higgenbotham's conduct, Officers Cavalli and Gonzalez decided to secure Higgenbotham with a seatbelt.  Officer Gonzalez opened the rear driver's side door, at which time Higgenbotham began pushing with his back against Gonzalez in an attempt to "push out of the police car."  (*Id.* at 60:4 to 19.)  Unable to get Higgenbotham fully inside the vehicle so the door could be closed, Officer Gonzalez informed Higgenbotham that if he did not comply with his commands to stop kicking and pushing out of the vehicle, he would use his pepper spray.  (*Id.* at 60:15 to 19; 65:5 to 14.)  Because Higgenbotham continued to resist Officer Gonzalez's commands, Officer Gonzalez administered one burst of his pepper spray.  (*Id.*)  Accordingly, Higgenbotham's behavior warranted the Officers' use of reasonable force to ensure a safe transport to the hospital for his crisis evaluation.

Nonetheless, viewing the facts in the light most favorable to Plaintiff, it remains a close question as to whether Officer Gonzalez's subsequent pepper sprays were excessive.  Issues of fact exist as to whether Officer Gonzalez knew or should have known that Higgenbotham was suffering adverse effects from the Officers' prior applications of pepper spray, including the inability to breathe, and these issues of fact could render Officer Gonzalez's decision to further

pepper spray Higgenbotham while he was handcuffed in the car unreasonable.[14]   Indeed, pepper

spray is "designed to disable a suspect," *Vinyard*, 311 F.3d at 1348 (internal quotation marks and

citation omitted), by causing "intense pain, a burning sensation that causes mucus to come out of

the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the

larynx," *Headwaters Forest Defense v. County of Humboldt*, 240 F.3d 1185, 1199-1200 (9th Cir.

2000), *vacated on other grounds*, 534 U.S. 801 (2001).   It sometimes also causes "disorientation,

anxiety, and panic" in the person sprayed.   *Id.* at 1200 (internal quotation marks omitted).   Those

effects are inherent in most, if not all, uses of pepper spray.   That is how it achieves its purpose.

If it could be found that Officer Gonzalez knew or had reason to know based on his training and

personal experience that Higgenbotham's behavior following his arrest, including his vocalized

inability to breathe, kicking, and swelling and burning of the eyes, were physical manifestations

of his duress from prior applications of pepper spray, then it could also be found that Officer

Gonzalez knew his subsequent pepper sprays of a restrained Higgenbotham were excessive.   To

that end, however, the Court is presented with conflicting accounts of the events following

Higgenbotham's arrest, including the number of sprays administered by Officer Gonzalez post-

arrest and Officer Gonzalez's knowledge of Higgenbotham's struggle to breathe and his

knowledge of any other potential indicators of Higgenbotham's adverse reaction to the chemicals

contained in the pepper spray, which raise genuine disputes of material fact as to whether Officer

Gonzalez's use of force was objectively reasonable.

Certainly, Officer Gonzalez had reason to believe that Higgenbotham was suffering from

a psychological episode or mental crisis and knew that Higgenbotham had been pepper sprayed at

---

[14]      Had Officer Gonzalez been aware that Higgenbotham was suffering adverse effects from
the pepper spray, he could have taken actions to either ameliorate those effects or could have
chosen to restrain and subdue Higgenbotham using alternative means.

least twice prior to being handcuffed.   Moreover, Officer Gonzalez testified, and Jackson corroborated, that Higgenbotham was sweating profusely as he was placed in the police car, and no evidence exists in the record that the police officers decontaminated Higgenbotham from the pepper spray prior to being placed in the police car.  (Gonzalez Dep. Tr. at 59:11 to 20; Jackson Dep. Tr. at 102:18 to 23.)  Most significantly, however, Douglas testified that while she could hear Higgenbotham kicking inside the police car, she also could hear Higgenbotham complaining of an inability to breathe.  (Douglas Dep. Tr. at 34:11 to 21, 37:23 to 38:4.)  These observations were also corroborated by Jackson who testified that he heard Higgenbotham say he could not breathe after being in the car for several minutes.  (Jackson Dep. 103:22 to 104:2.)  According to Douglas, the Officers initially instructed Higgenbotham to stop kicking, and Higgenbotham momentarily complied.  (Douglas Dep. Tr. at 36:4 to 15.)  However, shortly thereafter, Higgenbotham began kicking again.  (*Id.*)  Officer Gonzalez then walked over to car, opened the rear driver's side door, and instructed Higgenbotham to stop kicking.  (*Id.* at 37:23 to 39:14.)  When Officer Gonzalez opened the door, Douglas heard Higgenbotham state that he could not breathe approximately three or four times.  (*Id.*)  Officer Gonzalez closed the door, but Higgenbotham's kicking continued.  (*Id.*)  At this time, Douglas heard Officer Gonzalez say to his fellow police officers, "I'm tired of this shit," before he opened the rear driver's side door again and pepper sprayed Higgenbotham.  (*Id.*)  Despite being pepper sprayed, Douglas stated that Higgenbotham's kicking only intensified.  (*Id.* at 39:20 to 40:3.)  After what Douglas estimated to be two minutes of prolonged kicking, the officer again opened the rear driver's side door and pepper sprayed Higgenbotham a second time without warning.  (*Id.* at 42:22 to 44:10.)

Notably, the Trenton Defendants dispute Plaintiff's version of events, relying on the testimony of the Officers.  According to Officer Gonzalez, he pepper sprayed Higgenbotham only

once in the rear compartment of the vehicle.  (Gonzalez Dep. Tr. at 72:22 to 73:8.)  Moreover, testimony from the Officers suggests that at no point did Officer Cavalli, Officer Gonzalez, or Sergeant Kmiec hear Higgenbotham say that he could not breathe or that his face and eyes burned.  (Gonzalez Dep. Tr. at 63:22 to 64:5; Cavalli Dep. Tr. at 54:14 to 22; Kmiec Dep. Tr. at 46:21 to 48:13.)[15]  Rather, Officer Gonzalez testified only that he could hear Higgenbotham "mumbling," "yelling," and "cursing" inside the vehicle.  (Officer Gonzalez Dep. Tr. at 63:10 to 21.)  However, despite the windows of the police car being open, *see* Gonzalez Dep. Tr. at 64:10 to 14, Officer Gonzalez claims that he could not hear exactly what Higgenbotham was saying, all the while both eye-witnesses, Jackson and Douglas, heard Higgenbotham's pleas from further away than the Officers.  (*Id.* at 63:12 to 21.)

Based on these factual disputes, the law in this Circuit is clear.  At the very least, the facts in dispute must be determined by the testimony of the relevant actors at trial; the reasonableness of Officer Gonzalez's conduct, after Higgenbotham was handcuffed, must be determined by a factfinder.  S*ee*, *e.g.*, *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999).  Here, if it is determined that Officer Gonzalez knew or should have known that Higgenbotham, a man suffering from a mental crisis, was suffering adverse effects from prior applications of pepper spray, such that he could not breathe, then he also should have known that further pepper spraying Higgenbotham (potentially two more times) while he was handcuffed in the confined space of the police car would be detrimental to his safety and well-being.[16]  *See Lalonde v. Cnty. of Riverside*, 204 F.3d 947,

---

[15]    The Court notes that because Higgenbotham is deceased, there is no way to ascertain through his testimony whether his kicking in the rear compartment of the vehicle was an act of resistance or an attempt to signal his distress and inability to breathe.

[16]    Indeed, Plaintiff's medical expert, Michael M. Baden, M.D., opined that Higgenbotham died from "anoxic encephalopathy because his brain was deprived of oxygen during respiratory and cardiac arrests."  (Pl. Opp. to the Trenton Defendants' Motion for Summary Judgment, Exhibit

961 (9th Cir. 2000) (finding that "any reasonable officer would know that a continued use of the [pepper spray] or a refusal without cause to alleviate its harmful effects constitutes excessive force."); *Tedder v. Johnson*, 527 Fed.Appx. 269, 274 (4th Cir. 2013) (concluding that the plaintiff "created a genuine issue of material fact on the objective component of his Eighth Amendment excessive force claim" where his "adverse physical reactions to the pepper spray—gagging, breathing difficulty, and vomiting—establishe[d] that the nature of the force [the defendant correctional officer] used against [him] was nontrivial"); *United States v. Praisner*, No. 09-264, 2010 WL 4024779, at *4 (D. Conn. Aug. 17, 2010) (explaining that the use of pepper spray by police officers is not "always lawful," and noting, instead, that such claims "rise and fall based on specific facts"); *Fultz v. Whittaker*, 187 F.Supp.2d 695, 703 (W.D. Ky. 2001) (granting qualified immunity to officer on excessive force claim where officer used pepper spray on plaintiff and the only injury suffered was temporary discomfort).  Accordingly, on balance, an issue of fact exists as to whether Officer Gonzalez used excessive force in pepper spraying Higgenbotham when Higgenbotham was handcuffed in the back of the police car.  Thus, Officer Gonzalez has not satisfied the first step of the qualified immunity analysis, on this motion.

Because the Court has determined that a reasonable factfinder could find that a constitutional violation occurred, I must consider whether Higgenbotham's rights were "clearly established" at the time.  *See Green*, 246 F. App'x at 162.  The Trenton Defendants appear to argue that Officer Gonzalez's conduct did not violate any clearly established right because "under the New Jersey Attorney General Guidelines on the Use of Force, and citation offered by our Federal District, Circuit, and Supreme Courts, the Officers had a right to use reasonable force to [e]ffect

---

J at 7-8.)  According to Dr. Baden, this was caused, in part, by impaired breathing due to "too close facial pepper spray discharges and obstructed air passages in his nose, mouth and lungs."  (*Id.*)

his arrest and prevent Mr. Higgenbotham from causing harm to himself, others or property." (Trenton Def. Moving Br. at 19.)  In further support, the Trenton Defendants emphasize that the Mercer County Homicide Task Force, which investigated the Trenton Defendants' use of force against Higgenbotham, found "[n]o indication of any evidence that the officers used excessive force in their attempt to arrest Higgenbotham on June 15, 2015[.]"  Specifically, the Trenton Defendants argue that "[i]f the twelve officers comprising the Task Force came to the conclusion that the officers did not utilize excessive force," then the Officers "involved in a second-to-second, minute-to-minute struggle" with Higgenbotham "could not reasonably be anticipated to have concluded they were violating his clearly established constitutional rights."  (*Id.* at 20.)

The Third Circuit recently reiterated that "[c]learly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand what he is doing is unlawful."  *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S.Ct. 577, 589 (2018)).  Put differently, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  The Third Circuit has explained that:

> In the context of excessive force claims, [the Third Circuit has] relied on the factors set forth in *Graham* and *Sharrar* in evaluating whether an officer made a reasonable mistake.  We have stated that these factors "are well-recognized" and that when an officer applies them in "an unreasonable manner, he is not entitled to qualified immunity."

*Green*, 246 F. App'x at 162 (citations omitted).

Indeed, within the context of excessive force claims specifically, both the Supreme Court and Third Circuit have emphasized the importance of defining with particularity the clearly established law.  *See White v. Pauly*, 137 S. Ct. 548, 552 (2017); *Santini*, 795 F.3d at 417

(observing that the qualified immunity analysis "has more particularized requirements in an excessive force case"); *Estep v. Mackey*, 639 Fed.Appx. 870, 873 (3d Cir. 2016) (remanding case to the lower court to more specifically identify the right at issue, because the court's formulation of the right "as the Fourth Amendment right to be free from the excessive use of force ... lack[ed] the required level of specificity and [did] not address the question that needs to be answered in this context because it does not describe the specific situation that the officers confronted").

Here, the Court is mindful of defining the clearly established right with the appropriate level of specificity and takes into consideration the totality of the circumstances facing the law enforcement officers in this case; thus, I define the clearly established right as the following: whether it is clearly established that Higgenbotham had the right to be free from having pepper spray repeatedly applied to him while he was restrained and exhibiting physical manifestations of adverse effects from prior applications of pepper spray.  I answer that question in the affirmative. *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) (finding that "the use of pepper spray may be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee . . . is rendered helpless, any reasonable officer would know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force" (citations and quotations omitted)); *Nasseri v. City of Athens*, 373 Fed. Appx. 15, 19 (11th Cir. 2010) (holding that repeated pepper sprays in the back of a police vehicle constitute excessive force while the arrestee was not decontaminated, restrained and cried for medical help, and finding qualified immunity in this context is reversible error); *Tedder v. Johnson*, 527 Fed. Appx. 269, 274 (4th Cir. 2013) (concluding that the plaintiff "created a genuine issue of material fact on the . . . excessive force claim where his adverse physical reactions to the pepper spray—gagging, breathing difficulty, and vomiting—established that the nature of the force the

defendant correctional officer used against him was nontrivial" (citations, quotations and internal alterations omitted)); *Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994) (finding that an arrestee had the clearly established right to be free from repeated applications of mace where he had been maced prior to arrest, was handcuffed and placed in the police car, and subsequently maced again despite already being blinded and incapacitated from prior applications); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902-03 (6th Cir. 2004) (finding it is clearly established that police officers' use of pepper spray against an arrestee who was "handcuffed and hobbled" was excessive); *Oliver v. Fiorino*, 586 F.3d 898, 908 (11th Cir. 2009) (finding that the police officer's repeated tasering of the plaintiff over a two-minute span—including tasering the plaintiff while he was "writhing in pain on the hot pavement and after he had gone limp and immobilized"—violated a clearly established right); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) (finding that the continued kneeling on the back and neck of a compliant arrestee after the arrestee complained that he was choking and in need of air violates a clearly established right).

While the Court notes that there is no case in this Circuit directly on point, that is not dispositive. A case directly on point is not required to show a right is clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In other words, "there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001); *see also James*, 2020 WL 1922370, at *4 ("[C]learly established rights are derived from either binding Supreme Court and Third Circuit precedent or from a robust consensus of cases of persuasive authority in the Courts of Appeals.") (emphasis added) (citations and quotations omitted).

However, as the Court has explained, there are material questions of fact surrounding whether Officer Gonzalez's conduct, in pepper spraying Higgenbotham while he was handcuffed, was reasonable under the circumstances.  Resolution of these questions, specifically whether Officer Gonzalez knew or should have known that the pepper spray deployed by the Officers on the porch and in the bathroom had such a detrimental effect on Higgenbotham that it impaired his ability to breathe, is critical to any determination of qualified immunity.  Thus, because of the disputed facts regarding whether the use of force was reasonable, the Court will not grant summary judgment on the excessive force claim pursuant to the doctrine of qualified immunity.  *See Gonzalez v. Borough of Red Bank*, No. 18-13009, 2020 WL 2029338, at *6 (D.N.J. Apr. 28, 2020) (citing *Verdier v. Borough*, 796 F. Supp. 2d 606, 629 (E.D. Pa. 2011) ("Given the unresolved questions of fact as to claims of excessive use of force ..., it would be premature for the Court to determine whether a reasonable officer would believe he was following clearly established law under the circumstances.").

### C.      Failure to Intervene Claim

In the Count III of the Complaint, Plaintiff asserts a claim for failure to intervene under § 1983 against the Trenton Defendants.  Although the Trenton Defendants do not address the failure to intervene claim asserted against them, the Court recognizes its independent obligation to limit the claim where appropriate.

When an officer "'fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983.'" *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) (citing *Bryd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986) (holding that a fact finder could find that an officer had a duty to intervene where he observed an inmate being beaten and could have reasonably responded).  However, in order for

liability to attach on a failure to intervene basis, there must be "a realistic and reasonable opportunity to intervene." *Id.* at 650–51. In that regard, a plaintiff must establish that the defendant "'observed or had reason to know: (1) that excessive force was being used ... and (2) that he had a realistic opportunity to intervene and prevent the harm from occurring.'" *Roccisano v. Township of Franklin*, No. 11–6559, 2013 WL 3654101, at *10 (D.N.J. July 12, 2013) (internal quotations omitted); *see also Williams v. Fields*, 535 Fed. Appx. 205, 210 (3d Cir. 2013).

Here, Plaintiff alleges that Officer Cavalli, Officer Gonzalez, Officer Ramos, Sergeant Kmiec, and Chief Parrey had a clear duty to stop a fellow officer from using excessive force, *i.e.*, pepper spraying Higgenbotham while he was restrained. As a preliminary matter, Plaintiff's claim for failure to intervene against Officer Gonzalez and Chief Parrey are dismissed with prejudice.[17] Because Officer Gonzalez is alleged to have participated in the constitutional violation, Plaintiff may not assert a failure to intervene claim against him. *See Mazur v. Twp. of Marlboro*, No. 16-05527, 2020 WL 373343, at *5 (D.N.J. Jan. 23, 2020) (citing *Flint v. Cty. of Milwaukee*, 91 F. Supp. 3d 1032, 1064 (E.D. Wis. 2015) ("An officer cannot intervene in his own constitutional violation."). It is undisputed that Officer Gonzalez pepper sprayed Higgenbotham while he was

---

[17]     To the extent that Plaintiff also attempts to assert a claim for failure to intervene against the City of Trenton, that claim is also dismissed. It is well-settled that § 1983 imposes civil liability upon "any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Padilla v. Twp. of Cherry Hill*, 110 Fed.Appx. 272, 278 (3d Cir. 2004) (citation omitted). In addition, municipalities are legal entities amenable to suit for their unconstitutional policies or customs. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). Therefore, to recover against a municipality, a plaintiff must "demonstrate that municipal policymakers, acting with deliberate indifference or reckless indifference, established or maintained a policy or well-settled custom which caused a municipal employee to violate plaintiffs' constitutional rights and that such policy or custom was the 'moving force' behind the constitutional tort." *Hansell v. City of Atlantic City*, 152 F.Supp.2d 589, 609 (D.N.J. 2001). A municipality may also be liable if an employee acts unconstitutionally and the municipality failed to adequately train or supervise that employee. *City of Canton v. Harris*, 489 U.S. 378, 380 (1989). Here, Plaintiff agreed to the dismissal of her *Monell* claims against the City. (Pl. Opp. at 46.)

handcuffed in the police car, and that conduct is a basis for Plaintiff's excessive force claim, Plaintiff cannot assert such a failure to intervene claim against Officer Gonzalez.  The Court also dismisses the failure to intervene claim as to Chief Parrey because the Complaint contains no allegations that Chief Parrey observed or had reason to know that excessive force was potentially being used on Higgenbotham.  Indeed, it is not alleged anywhere in Plaintiff's Complaint, nor can it be construed from the evidence in the record, that Chief Parrey was even at the scene of the incident.

As for the remaining Trenton Defendants, however, summary judgment is denied.  Officer Cavalli acknowledges that he was alongside Officer Gonzalez when Officer Gonzalez pepper sprayed Higgenbotham in the police car.  Officers Cavalli and Gonzalez testified that they made the joint decision to secure Higgenbotham with a seatbelt, and Officer Cavalli assisted Officer Gonzalez with efforts to subdue Higgenbotham's continued kicking.  (Cavalli Dep. Tr. at 48:18 to 50:6; Gonzalez Dep. Tr. at 64:15 to 65:14.)  As for Sergeant Kmiec, testimony from Officers Cavalli and Gonzalez suggest that he was nearby when Higgenbotham was handcuffed in the back of the police car.  (Cavalli Dep. Tr. at 55:7 to 11; Gonzalez Dep. Tr. at 78:4 to 12.)  Moreover, Sergeant Kmiec himself testified that he heard Higgenbotham violently kicking inside the patrol car.  (Kmiec Dep. Tr. at 46:10 to 20.)  Finally, while there is no evidence in the record that Officer Ramos observed Officer Gonzalez pepper spray Higgenbotham inside the vehicle, Officer Ramos did acknowledge that he was present at the scene when Higgenbotham was arrested and approximately ten feet from the police car when he heard Higgenbotham kicking inside the vehicle. (*See* Officer Ramos Video Recording Tr., Pl. Opp., Ex. L at 9:23 to 13:10.)  As the Court held *supra*, a reasonable jury could find that Officer Gonzalez's use of pepper spray on a handcuffed Higgenbotham could be considered the use of excessive force based on the fact that Higgenbotham

was restrained, complained of an inability to breathe, and no threat of flight or personal harm existed.  Therefore, by failing to attempt to prevent those actions, Officer Cavalli, Officer Ramos, and Sergeant Kmiec could be found by a reasonable jury to have approved Officer Gonzalez's potentially unconstitutional conduct.

> **D.      New Jersey Civil Rights Act Claim**

In Count Five of the Complaint, Plaintiff asserts claims against the Trenton Defendants under the NJCRA that mirror his constitutional claims, *i.e.*, that Officers Cavalli and Gonzalez used excessive force during Higgenbotham's arrest.  Courts in New Jersey view the NJCRA as analogous to § 1983, *see*, *e.g.*, *Hedges v. Musco*, 204 F.3d 109, 121 n.12 (3d Cir. 2000); *Van Tassel v. Ocean Cty.*, No. 16–4761, 2017 WL 5565208, at *6 (D.N.J. Nov. 17, 2017); *Velez v. Fuentes*, No. 15–6939, 2016 WL 4107689, at *5 (D.N.J. July 29, 2016); *Hottenstein v. City of Sea Isle City*, 977 F. Supp. 2d 353, 365 (D.N.J. 2013); *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011).  Accordingly, Plaintiff's NJCRA claims will be interpreted analogously to her § 1983 claims.  *Trafton*, 799 F. Supp. 2d at 443–44; *see Hedges*, 204 F.3d at 121 n.12 (concluding New Jersey's constitutional provisions concerning search and seizures are interpreted analogously to the Fourth Amendment).  Consistent with its findings herein, the Court dismisses Plaintiff's NJCRA claim only with respect to the force used by Officers Cavalli and Gonzalez prior to Higgenbotham's arrest.  Because the Court has found that a reasonable jury could conclude that Officer Gonzalez's use of force after arrest was not "objectively reasonable," the Court will not enter summary judgment in favor of the Trenton Defendants on that portion of Plaintiff's NJCRA claim.

IV.     **CONCLUSION**

For the reasons set forth above, the Trenton Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part as follows: summary judgment is **GRANTED** in favor of the Trenton Defendants on Plaintiff's false arrest and/or false imprisonment claim under § 1983 (Count II) and any analogous claims asserted under the NJCRA, and **GRANTED** as to Plaintiff's claims of excessive force under § 1983 (Count I) and any analogous claims asserted under the NJCRA, as to the alleged force used before Higgenbotham was arrested and placed in handcuffs. However, summary judgment is **DENIED** on Plaintiff's excessive force claims under § 1983 and the NJCRA, as it relates to the alleged force applied by Officer Gonzalez after Higgenbotham was handcuffed.  In that regard, the excessive force claims under both statutes are dismissed against all other Trenton Defendants.  In addition, with respect to Plaintiff's failure to intervene claim under § 1983 (Count III), including any analogous claims asserted under the NJCRA, summary judgment is **GRANTED** in favor of Officer Gonzalez, Chief Parrey, and the City of Trenton, but it is **DENIED** as to Officer Cavalli, Officer Ramos, and Sergeant Kmiec.  Finally, summary judgment is **DENIED** as to all remaining state law claims against the Trenton Defendants.

Dated: February 11, 2021                                       /s/ Freda L. Wolfson
                                                              Freda L. Wolfson
                                                              U.S. Chief District Judge